

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 18, 2024

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States* v. *Iszayah Rowson, a/k/a "Zay," a/k/a "Zay Munna"*, 22 Cr. 310 (LJL)

Dear Judge Engelmayer:

The Government respectfully submits this letter in advance of the defendant Iszayah Rowson's sentencing scheduled on March 25, 2024 at 11:00 a.m.  For the reasons set forth below, the Government believes that a sentence within the low end of the Stipulated Guidelines Range of 181 to 211 months' incarceration would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

## I.     Offense Conduct

From at least in or about 2019 to March 2022, Rowson was a member of Third Side, a violent street gang operating mainly on 183rd Street between Crotona Avenue and Prospect Avenue in the Bronx.  (Presentence Report ("PSR") ¶ 20).  Members and associates of Third Side made money by selling drugs and committing bank and wire fraud.  (PSR ¶ 21).  Members and associates of Third Side had conflicts with many other gangs, which resulted in frequent back-and-forth shootings that terrorized the community.  (PSR ¶ 20).  Despite Rowson's young age, he was perceived by others to be something of a leader in Third Side, insomuch that he had influence over the other members of the gang.  Indeed, it was under Rowson's influence, that many of the members of Third Side joined the Crips, a national gang, like Rowson himself.[1]

Rowson himself directly participated in bank and unemployment fraud to fund his activities within Third Side.  (PSR ¶ 24.)  Rowson routinely posted Stories on Instagram recruiting other individuals to participate in bank fraud with him. For example, on one occasion, Rowson posted an Instagram story asking people to "TD Me," followed by a screenshot of an online bank access to a TD bank account with a recent check deposit for over $6,000.  This is a commonly-seen form of bank fraud, where scammers would recruit others who have established bank accounts at certain banks to have those others turn control over their bank accounts to the scammers, who would then

---

[1] Members of Third Side were frequently also members of national gangs like the Crips or the Bloods.

deposit fraudulent checks into those bank accounts and withdraw the money before the banks realize that the checks are fraudulent.

As part of his membership in Third Side, Rowson represented Third Side and was often considered the face of Third Side in his internet persona, including in the rap music videos that he released under his moniker Zay Munna.  In some of these videos, Rowson would rap about Third Side's rivalry with other gangs in New York City, and his intent to act on those rivalries, including by carrying out acts of violence.  In addition to the music, Rowson also posted Instagram stories and livestreams where he also represented Third Side and antagonized gang rivalries. (PSR ¶ 23).

Flowing from the gang rivalries between Third Side and other gangs in New York, Rowson committed shootings at rival gang members in rival gang territory.  Specifically, on or about June 20, 2020, at approximately 5:00 a.m., Rowson and three others, including his co-defendant Michael Gant, traveled to a residential building in the territory of a rival gang called the 800 YGz with the intent to murder 800 YGz members who may be socializing in front of the building.  (PSR ¶ 26).  Based on one of the shooter's recounting later, Rowson and others approached to shoot at 800 YGz in front of the building twice.  Ultimately, four people were shot, including a member of 800 YGz who was shot in the face, and two minor girls.  (PSR ¶ 27).  Approximately one month later, Rowson and three others released a music video called "Who Really Bugging."  In this music video, Rowson and others rapped about what had happened and appeared to be bragging about their exploits in hitting members of the 800 YGz.  (PSR ¶ 28).  For example, Rowson himself narrated his and others involvement in the shooting: "hop out the V get to boomin', he try to run then Munchy gon' shoot him… Bro gotta Toolie and I got the Ruger, Four opps got hit that's movie," and then later he rapped regarding the gang-related motivation for the shooting: "Monterey, Sev Block, that's gang ties, they know Third Side, I bang mine, hit a opp in his face till his gang slide."  (PSR ¶ 28).  The song then ends with another rapper saying "big YGk," referring to themselves as "big" "YG" killers.

On another occasion, on December 13, 2020, at approximately 3:50 a.m., Rowson and four others traveled to the vicinity of another building in the 800 YGz territory.  (SPR ¶ 29).  Surveillance videos captured Rowson and the four others creeping behind cars, consistent with an attempt to hide themselves from their target.  Rowson then shot directly at a known member of the 800 YGz in front of a residential building.  (PSR ¶ 29).  Luckily Rowson missed, and the victim was uninjured.

In addition to these two shootings that are known to law enforcement, Rowson was captured in possession of loaded firearms on at least two other occasions—once in April 8, 2021, and March 5, 2022.  (PSR ¶¶ 30, 31).

## II.   Calculation of the Guidelines

The Probation Office calculated the Guidelines range on Count One to be 188 to 235 months' imprisonment as follows: Under Count One, pursuant to U.S.S.G. § 2E1.1(a)(2), the Probation Office calculated as a group for each o f the four victims who were injured during the June 20, 2020 shooting, as well as the victim who was shot at during the December 13, 2020 shooting, although the Government did not include that shooting as a predicate act in its own

consideration of the Guidelines in the plea agreement. The Probation Office also considered as a separate group the defendant's participation in narcotics distribution. Accordingly, because the Probation Office applied the cross-reference to U.S.S.G. § 2A2.1 for first degree attempted murder and applied the serious bodily injury enhancement for each of the four victims of the June 20, 2020 shooting, the adjusted offense level under U.S.S.G. 3D1.4 is 39.[2] A three-point reduction was warranted because the defendant timely accepted responsibility, rendering the total offense level 36. The Probation Office, as did the Government, calculated the defendant's criminal history score is zero, yielding a criminal history category of I.

Defense argues that the Probation made two errors: First, that the Probation Office should not have counted each of the victims of the June 20, 2020 shooting as its own group, and Second, that the Probation Office should not have included the December 13, 2020 shooting as its own group since the Government did not include it in the Guidelines calculation.

At the outset, the Government notes that the Government stands by the Stipulated Guidelines Range as calculated in the plea agreement, which was the product of considered plea negotiations between the parties, and the Government believes that a sentence on the low end of the Stipulated Guidelines Range is appropriate in light of the Section 3553(a) factors regardless of which Guidelines the Court applies. While the Court must consider the Guidelines, the Court need not resolve a dispute about which Guidelines ranges apply if it makes clear that it would impose the same sentence under either possible Guidelines range in light of Section 3553(a) factors. *See United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005), *abrogated on other grounds by United States v. Smith*, 949 F3d. 60 (2d Cir. 2020) (holding that "precise calculation of the applicable Guidelines range" is unnecessary if the District Court decides that it would impose the same sentence "regardless of which of the two ranges applies," explaining that "this leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters."); *see also United States v. Borrego*, 388 F.3d 66 69 (2d Cir. 2004) ("when the [Guidelines] dispute at issue has no bearing on the determination of the sentence duration, district courts need not rule on disputes concerning offense level adjustments"); *United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009) ("We reiterate here that the district court is not bound in ambiguous circumstances such as these to choose one Guideline range in particular, and is free to take the more flexible—and often, more direct—approach of arriving at a more appropriate sentence outside the Guidelines. In light of *Booker*, the judge could simply look at all the facts, take both suggestions into account, consider the § 3553(a) factors, and come up with a 'hybrid' approach if he so chose."); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) (the court "need not select between the two arguably applicable guidelines ranges if it is satisfied that the same sentence would have been imposed under either guideline range"); *United States v. Bermingham*, 855 F.2d 925, 930-32 (2d Cir. 1988) ("[G]uideline disputes may be left unresolved where the same sentence would have been imposed under either of two overlapping guideline ranges.").

---

[2] According to the Probation Office's calculation of the base offense level applicable to the December 13, 2020 shooting and the narcotics trafficking, the base offense levels for those predicates are too low to factor into the calculation of the overall offense level.

Hon. Paul A. Engelmayer  Page 4
March 25, 2024

As to the first objection, the Government notes that the Guidelines is ambiguous as to whether a single shooting event—such as the one at issue here—can be broken up into groups for each of the affected victims. As the Probation Office points out, in the "Background" section of the application notes to Section 3D1.2, which deals with when counts should be grouped together, the Guidelines say that it has considered and rejected the proposal that "all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims," and believes that in cases involving injury to distinct victims, "each such count should be treated separately rather than grouped together," making the policy determination that a person who injured three people in one transaction is comparable in culpability to a person who injured three people on three separate transactions. This policy statement lends some support to Probation's view that each victim of the June 20, 2020 shooting should be treated separately for the purpose of Guideline calculations. However, the policy statement also appears to ponder a situation where the Government would have brought separate counts for each of the victims in a single transaction, and each victim represents an independent count of conviction, and the question becomes whether those counts should be grouped or not. Here, the June 20, 2020 shooting was charged as a single predicate for the racketeering conspiracy count, and so it is unclear whether this policy statement applies.

Furthermore, in instances where the Guidelines clearly contemplates treating each victim separately even where a single count encompassed multiple victims, the Guidelines has been explicit on that point. For example in U.S.S.G. § 2G1.1, the applicable guideline governing offenses that promote a commercial sex act, § 2G1.1(d)(1) specifically provides that "if the offense involved more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction." By contrast, U.S.S.G. § 2A2.1, the applicable Guideline for attempted murder does not include clear instructions.

In any event, even if the Guidelines *do* contemplate separating each of the Victim into individual groups, the Government disagrees with the Probation Office's application of the injury enhancements.[3] The Government believes that the enhancement for serious bodily injury does apply for Victims-1 through Victim-3. Victim-1 was shot in the face and required medical intervention to extract the bullet, Victim-2 and Victim-3 were both shot in the leg. However, because Victim-4 suffered only a bullet graze to her shoulder, we do not believe that the serious bodily injury enhancement applies.

Second, as to defense's argument that the December 13, 2020 shooting should not have been included as a separate predicate under Count One, the Government stands by the Stipulated Guidelines set forth in the plea agreement, which specifically did not contemplate the December 13, 2020 shooting as a separate predicate—a result negotiated by the parties. However, the Government recognizes that because the defendant, by virtue of the plea agreement, admitted to his conduct in committing the December 13, 2020 shooting, the Guidelines should include that

---

[3] The Government recognizes that it is at fault for not responding to Probation Office earlier after the initial disclosure when the error was made.

additional conduct, pursuant to U.S.S.G. § 1B1.2(a)-(c).[4] The Government erred in the way it had structured its plea agreement, and it will take care to not make this error in the future. In any event, the Government stands by the Stipulated Guidelines as the appropriate Guidelines contemplated by the parties.

### III. Discussion

#### A. Applicable Law

Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

---

[4] The Government does not object to Probation Office's categorization of the December 13, 2020 shooting as an aggravated assault based on the current record, without more, because the defendant did not admit to an intent to kill when he shot at the victim during that incident. This would not necessarily be the Government's position outside of the context of a negotiated plea with stipulated facts.

### B. A Sentence Within At the Bottom of the Stipulated Guidelines Range of 181 to 211 Months' Imprisonment is Warranted in this Case

The Government respectfully submits that a sentence at the low end of the Stipulated Guidelines Range of 181 to 211 months' imprisonment is necessary in this case to reflect the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment for the offense.

A significant Guidelines sentence is necessary here to reflect the seriousness of the defendant's crimes and the harm that he caused to the Victims and to the community. As recounted above, the defendant was an enthusiastic member of Third Side, a violent street crew that engaged in multiple shootings with rival gangs. The defendant was not just an in-name-only member, but he willingly participated in nearly all aspects of the gang's activities, from bank fraud and narcotics trafficking to shooting at rival gang members.

It goes without saying that the defendant's actions in going out and shooting at multiple individuals on multiple occasions is extraordinarily serious conduct that demands serious punishment. For example, as a result of the June 20, 2020 shooting, one person was shot in the face, with a bullet lodged in his jaw. Two other victims were shot in the leg, one of whom was a sixteen-year-old minor. A bullet grazed the shoulder of another minor victim. But more than his participation in the shootings, the defendant promoted the cycle of violence between Third Side and rival gangs but committing these heinous acts of violence and then advertising them on the internet in his music videos and in social media posts, which fueled the fire that burned across communities.

The Government does not discount the difficult childhood that may have led the defendant to make some of the choices that have led him here. The Government's recommendation recognizes and acknowledges those difficulties. However, difficult circumstances alone do not account for or excuse the defendant's conduct. Not everyone who grew up in similar circumstances turn to gangs, and not every gang member commits shootings and promote violence as the defendant did. By his conduct, the defendant terrorized neighborhoods—his own included—and created some of the same circumstances of frequent, everyday violence that the defendant complained as having traumatized him when he was growing up.

A significant sentence here can also provide significant deterrence value both to the defendant and also to similarly situated individuals. For a few years, the defendant appeared to have lived a life of perpetual criminality. A long sentence here is necessary to demonstrate to the defendant that though he may escape punishment for some period, he cannot escape his just deserts for long. Moreover, the need for general deterrence is especially pertinent here where the defendant has put himself forward as a public figure in his community, and to send a message that committing crimes and violence for fame comes with very real consequences.

Hon. Paul A. Engelmayer　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 7
March 25, 2024

IV. **Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the low end of the stipulated Guidelines range of 181 to 211 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

　　　　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　DAMIAN WILLIAMS
　　　　　　　　　　　　　　　　　　　　　　United States Attorney for the
　　　　　　　　　　　　　　　　　　　　　　Southern District of New York

　　　　　　　　　　　　　　　　　　By:　　/s/
　　　　　　　　　　　　　　　　　　　　　　Elizabeth Espinosa/James Ligtenberg/
　　　　　　　　　　　　　　　　　　　　　　Ni Qian
　　　　　　　　　　　　　　　　　　　　　　Assistant United States Attorneys
　　　　　　　　　　　　　　　　　　　　　　(212) 637- 2364

cc:　　Counsel for Iszayah Rowson (by CM/ECF)